In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00177-CV**
_____

**KEVIN ANDRUS, Appellant**

**V.**

**VESTAS-AMERICAN WIND TECHNOLOGY, INC. and SEA.O.G., LLC,
Appellees**

_____

**On Appeal from the 136th District Court
Jefferson County, Texas
Trial Cause No. D-202,839**
_____

**MEMORANDUM OPINION**

Andrus appeals from a traditional and no-evidence summary judgment granted in favor of Appellees; he urges reversal, contending that (1) Appellees owed him a duty of care; and (2) there were issues of material fact as to causation, damages, and his allegation of gross negligence. Finding no reversible error, we affirm the trial court's judgment.

1

# I. Background

Appellee Vestas-American Wind Technology, Inc. (Vestas) is in the business of manufacturing and importing wind turbine components. These component parts, including towers, hubs, nacelles, and blades, arrive in this country via ship. After arrival, they are offloaded from the ship and are transported by truck to a storage area, from which they eventually are transported, again by truck, to be loaded onto railroad cars for transit to their destination, where they will be assembled into wind farms for the production of electric energy.

To facilitate the movement of wind turbine components within a port area, Vestas contracted with SEA.O.G (SEA or Sea of Gravity) to provide general oversight services and with P.C. Pfeiffer Company ("P.C. Pfeiffer"), Andrus' employer, to provide stevedore services. These contracts specify that SEA and P.C. Pfeiffer are independent contractors. The contract between Vestas and SEA contains a global safety provision, which states:

> Contractor [SEA] shall be solely responsible for all aspects of safety in connection with the performance of the Services and shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to, persons or property. Company shall have [the] right to terminate this Agreement immediately for cause upon written notice to Contractor of a violation of Company's safety policies or site rules[.]

The contracts provide for the application of Oregon law without regard to conflict of law provisions. As between VESTAS and SEA, SEA had the obligation

2

to take reasonable precautions to protect VESTAS' cargo from losses or causing an injury. The contract between Vestas and P.C. Pfeiffer made P.C. Pfeiffer "solely responsible for all aspects of safety in connection with the performance of the Services" it agreed to perform under its agreement with Vestas. And it required P.C. Pfeiffer to "take reasonable precautions for safety of, and [to] provide reasonable protection to prevent damage, injury or loss to, persons or property."

The evidence presented by Andrus shows that while working at the Port of Beaumont for P.C. Pfeiffer, Andrus was injured when he fell from a man basket while unhooking the crane from the far side of the blade frame as the turbine blade was resting on the truck. More specifically, Andrus had partially stepped out of the man basket to reach the unhooking point.[1] As he was pulling himself back into the basket, the piece of the basket he was holding became detached, resulting in the fall. Eventually, Andrus sued, among others, Vestas and SEA. He alleged that, notwithstanding contrary contractual provisions, Vestas and SEA maintained a right of control over the details of the work and their negligence and gross negligence led to his injury. He further alleged that both Appellees controlled the premises, that he was their invitee, that they knew or should have known of the unreasonably dangerous condition of the premises that posed an unreasonable risk, and that they

---

[1] The evidence indicates that Andrus may have been hooking the crane to the blade frame, rather than unhooking it, but this minor discrepancy does not affect the disposition of this case.

3

were negligent in failing to inspect or warn him of the danger, or to make safe the defective equipment that caused his injury.

## A. Kevin Andrus' Deposition Testimony

In addition to describing the mechanism of injury, the physical specifics of the injury, his course of treatment and recovery, and his ability to return to work, Andrus testified that his supervisor was a P.C. Pfeiffer employee, and that the equipment involved in the accident, including the man basket and the forklift, were the property of P.C. Pfeiffer, his employer. He further stated that William Horne, whom Andrus erroneously identified as a Vestas employee, never instructed him as to safety procedures or other details of his work. [2,3]

## B. Charles Borneman's Deposition Testimony

Borneman is Vestas' senior purchaser for transport. He outlined his educational background and described his job duties as managing the vendors who transport project cargo from the factory to its destination. Vestas, itself, does not unload parts or oversee those who do.

He characterized SEA's relationship to Vestas as that of an independent contractor, as set forth in the parties' July 11, 2016, contract, and described SEA's

---

[2] Although Andrus did not mention Horne by name, other evidence shows that Andrus was describing Horne.

[3] Mr. Horne's testimony reveals that he worked for SEA, and not for Vestas. Other evidence reveals the business relationship between SEA and Vestas: SEA was an independent contractor of Vestas.

4

responsibilities as monitoring the movements of Vestas' products and overseeing Vestas' independent contractors, including stevedores. He acknowledged that the contract between Vestas and SEA included the duty to ensure compliance with industry standards and Vestas' policies, and further empowered SEA to halt the work if it observed a safety violation, but reiterated that SEA, and not Vestas, decided how to perform its contractual obligations. He defined "yard service" as the movement of components within a port facility and confirmed that Vestas' subcontractors were charged with handling Vestas' cargo according to Vestas' instructions, but again reminded counsel that the subcontractor would have been the one to determine how best to carry out the procedures so that Vestas' products were not damaged.

When discussing the master port service agreement, the contract between Vestas and P.C. Pfeiffer, Borneman confirmed that P.C. Pfeiffer bore the responsibility of providing its own tools and of working safely. P.C. Pfeiffer, like SEA, was an independent contractor, and was free to implement Vestas' procedures in any manner, provided that no damage to the cargo resulted. Vestas retained no authority to direct the day-to-day activities of P.C. Pfeiffer or its employees.

## C. James Clouse's Deposition Testimony

Clouse owns SEA, a company he founded in 2015. SEA functions as the on-site representative of cargo shippers, in this case Vestas, and observes and reports relevant information to the cargo owner. In September of 2018, when Andrus was

5

injured, SEA had a contract with Vestas; this contract tasked SEA with the duties of overseeing the loading of wind turbine components onto railroad cars at the Port of Beaumont, to ensure that the process was completed in a satisfactory manner. Clouse specifically testified that SEA was not charged with oversight of Andrus' job activities. Clouse described the usual flow of operations, and noted that "in a perfect world," the handling of Vestas' cargo would follow the company's prescribed procedures. He cautioned, however, that, when necessary, Vestas would consider deviating from its procedures.

When discussing the 2018 contract between Vestas and SEA, Clouse indicated that "yard service" included loading or unloading cargo from a ship or railroad car, but also encompassed surveying the operations involved in cargo being put into or taken out of storage, which is what Andrus was doing when he was injured.

Clouse testified that SEA was an independent contractor with Vestas and was not a partner or joint venture. Pursuant to that independent contractor status, Vestas neither trained SEA personnel nor instructed Clouse on their training. SEA likewise had no supervisory authority over P.C. Pfeiffer, its work, or its employees, including Andrus. Clouse further testified that SEA was only required to "observe" the placement of the cargo on a transport truck.

6

**D. William Horne's Deposition Testimony**

Horne was the SEA representative present at the Port of Beaumont when Andrus' injury occurred. His job duties consisted of verifying and assuring the security and condition of Vestas' cargo being loaded onto railroad cars. His responsibilities did not include loading the blades onto trucks to move them from the yard to the railroad cars. Therefore, he was not involved in the job that Andrus was performing when he was injured. Although Horne was aware of Andrus' injury and reported it to Vestas as instructed, he did not witness it, as his own job duties placed him approximately 100 yards away from Andrus' location when the accident occurred. Horne testified that he had never reported any similar incidents prior to or after this incident.

Horne testified he had no knowledge of the business relationships between P.C. Pfeiffer and Flanagan, or between Vestas and SEA. He also did not know who directed Andrus' work on the day of the accident. Horne stated he did not direct Andrus' work that day and that Vestas did not direct him to do so.

## II. Standard of Review

The summary judgment standards of review are well-known. We review de novo the trial court's order granting summary judgment. *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 644 (Tex. 2009) (per curiam); *Wyly v. Integrity Ins. Sol.*, 502 S.W.3d 901, 904 (Tex. App.—Houston [14th Dist.] 2016, no

7

pet.). We consider the evidence in the light most favorable to the non-movant and indulge reasonable inferences and resolve all doubts in its favor. *See City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005); *Wyly*, 502 S.W.3d at 904. "We credit evidence favorable to the non-movant if reasonable fact finders could and disregard contrary evidence unless reasonable fact finders could not." *Wyly*, 502 S.W.3d at 904.

When both no-evidence and traditional grounds for summary judgment are asserted, we first review the trial court's order under the no-evidence standard. *PAS, Inc. v. Engel*, 350 S.W.3d 602, 607 (Tex. App.—Houston [14th Dist.] 2011, no pet.). To prevail on a no-evidence summary judgment, the movant must allege that no evidence exists to support one or more essential elements of a claim for which the non-movant bears the burden of proof at trial. Tex. R. Civ. P. 166a(i); *Kane v. Cameron Int'l Corp.*, 331 S.W.3d 145, 147 (Tex. App.—Houston [14th Dist.] 2011, no pet.). A no-evidence motion may not be conclusory but must, instead, give fair notice to the non-movant as to the specific element of the non-movant's claim that is being challenged. *See Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310-11 (Tex. 2009). The non-movant must then present evidence raising a genuine issue of material fact on the challenged elements. *Kane*, 331 S.W.3d at 147. A fact issue exists where there is more than a scintilla of probative evidence. *See Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex. 2012) (per curiam). More than a scintilla of evidence

exists if the evidence rises to a level that would allow reasonable and fair-minded people to differ in their conclusions as to the existence of a vital fact. *Dworschak v. Transocean Offshore Deepwater Drilling, Inc.*, 352 S.W.3d 191, 196 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)).

To prevail on a traditional motion for summary judgment, a movant must establish that no genuine issue of material fact exists so that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). Summary judgment is appropriate if the movant conclusively negates at least one essential element of the plaintiff's claim. *Wyly*, 502 S.W.3d at 904-05.

### III. Analysis

All parties propose that the disposition of this case hinges on the right of control that Vestas and SEA retained over P.C. Pfeiffer and P.C. Pfeiffer's employees, including Andrus.[4] Andrus argues that Vestas and SEA retained the right to control the details of his work and they therefore bore a commensurate duty to

---

[4] Because no party produced evidence enabling the trial court to determine and apply Oregon law, as prescribed by the applicable contracts, we must presume that Oregon law is identical to our own and analyze the issues accordingly. *See* Tex. R. Evid. 202; *Grizzly Mountain Aviation, Inc. v. Honeywell Int'l, Inc.,* No. 13-11-00676-CV, 2013 WL 5676069, at *2 (Tex. App.—Corpus Christi-Edinburg Oct. 17, 2013, no pet.) (mem. op.).

exercise reasonable care. *See Hoechst-Celanese Corp. v. Mendez,* 967 S.W.2d 354, 355 (Tex. 1998).

Independent contractor status is determined by the right of control over the details of the work. *See Farlow v. Harris Methodist Fort Worth Hosp*., 284 S.W.3d 903, 911-12 (Tex. App.—Fort Worth 2008, pet. denied). When, as in this case, that status is set forth in a contract, the terms of the contract are dispositive, barring certain limited exceptions. *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 865 (Tex. 2021). One such exception applies when a party proves the general contractor controlled or retained the right to control the details of the subcontractor's work. *Id.* Andrus claims that this exception precluded the trial court's summary judgment against him as to both Appellees.

### A. Vestas

"As a general rule, one who employs an independent contractor has no duty to ensure that the contractor performs its work in a safe manner." *AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289, 295 (Tex. 2020) (citation omitted). Our Supreme Court has "recognized an exception to this rule, however, when 'the employer retains some control over the manner in which the contractor performs the work that causes the damage.'" *Id.* Vestas and Andrus seek to apply the general rule and the exception to their respective positions in this case.

Vestas observes that P.C. Pfeiffer was its independent contractor, and that Vestas' contract with P.C. Pfeiffer made P.C. Pfeiffer "solely responsible for all aspects of safety in connection with the performance of the Services" described in the contract. Vestas therefore contends that it had no duty to P.C. Pfeiffer or Andrus to ensure that either P.C. Pfeiffer or Andrus worked safely.

Andrus responds that Vestas, through "its agent" SEA, maintained sufficient control over the work as to deprive Vestas of the legal protection it would be afforded in an independent contractor relationship.[5] *See JLB Builders,* 622 S.W.3d at 863 (noting that "[a] general contractor owes a duty of care to its independent contractor's employees if the general contractor retains actual or contractual control over the means and methods of the independent contractor's work."). In support of his position, Andrus cites the contractual provision requiring P.C. Pfeiffer to provide "[s]ervices consistent with good industry practice, and in strict conformance to the safety requirements of Section 3.6 and applicable laws, rules, regulations," and the like. Andrus further points to the contract between Vestas and SEA, which contract required SEA "to stop work and conduct a safety stand down meeting" in the event of a safety violation. According to Andrus, the cited contractual terms gave Vestas control over P.C. Pfeiffer's and Andrus' work, and Vestas thus was liable for

---

[5] The contract between Vestas and SEA expressly disclaims an agency relationship.

11

Andrus' injury under the rationale of *Lee Lewis Constr. v. Harrison*. 70 S.W.3d 778, 782 (Tex. 2001) (affirming a judgment against a general contractor who retained sufficient control over its subcontractor's work practices, and therefore owed a legal duty to the subcontractor's employee). We disagree.

Contrary to Andrus' argument, an independent contractor relationship is not compromised by requiring the contractor to follow applicable laws and safety rules. *See Hoechst-Celanese Corp.*, 967 S.W.2d at 356-57. Instead, to decide whether Vestas owed Andrus a duty when it reserved the authority (through SEA) to stop the work in the event of safety violations, we examine the summary judgment evidence to determine whether Vestas contractually retained or actually exercised its right of supervision such that P.C. Pfeiffer was not entirely free to do the work in its own way. *See Koch Refin. Co. v. Chapa*, 11 S.W.3d 153, 155-56 (Tex. 1999); *White v. DR & PA Deliverance, Ltd.*, No. 01-12-00227-CV, 2014 WL 767218, at *2 (Tex. App.—Houston [1st Dist.] Feb. 25, 2014, no pet.) (mem. op.). As the *White* court noted, a right of control requires more than the following:

> [A] general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right to supervision that the contractor is not entirely free to do the work in his own way.

*Id.*

12

Here, as in *White*, the summary judgment evidence established that Vestas had no more than a generalized right to stop the work when necessary to assure safety. Absent evidence that Vestas retained the right to control, or actually controlled the details of P.C. Pfeiffer's work, we conclude that P.C. Pfeiffer was an independent contractor when Andrus was injured. Consequently, we agree with the trial court's conclusion that Andrus failed to establish that a genuine issue of material fact existed on the question of whether Vestas owed Andrus a duty to take any type of action to ensure the safety of Andrus' work. *See JLB Builders,* 622 S.W.3d at 863; *Hoechst-Celanese Corp.*, 967 S.W.2d at 356. That duty belonged to P.C. Pfeiffer under the contract.

Andrus contends that the *Hoechst-Celanese* opinion favors his position, because the court held that "an employer who is aware that its contractor routinely ignores applicable . . . [safety policies] may owe a duty to require corrective measures to be taken or to cancel the contract." *Id*. at 357 (citation omitted). However, having the right to shut down a job site for safety violations does not confer a duty to make sure the job site is safe. *See White*, 2014 WL 767218 at *2. Furthermore, there is no evidence that Vestas was aware that P.C. Pfeiffer or its employees were routinely violating its safety policies. First, Andrus didn't establish that Vestas had a specific safety policy that applied to the work that would have prevented P.C. Pfeiffer from using a man basket when performing the work. Second,

13

there isn't evidence that any Vestas employees were present at the port who exercised actual control over the means, methods or details of the work that Andrus was performing on the day that he fell. For example, no one testified that Andrus or any P.C. Pfeiffer employee was instructed by any Vestas or SEA employees about the details of how they were to move the wind turbine blade with which Andrus was working on the day that his injury occurred. There is also no evidence that Vestas or SEA supplied the man basket to P.C. Pfeiffer or that any of their employees inspected it before Andrus' injury occurred.

Under the "Master Port Services Agreement" between P.C. Pfeiffer and Vestas, P.C. Pfeiffer was an "independent contractor." Nothing in the Port Services Agreement provides Vestas or SEA with a retained right of control over the means, methods, or details of P.C. Pfeiffer's work. *See JLB Builders*, 622 S.W.3d at 863. Evidence that the owner of a cargo hired a company to place an individual at a port to provide general oversight services on a jobsite where the owner's cargo was to be moved into warehouses by employees of another company's employees, who were also independent contractors and also hired by the owner of the cargo, does not mean the owner of the cargo incurs a duty to the independent contractor's employees to intervene and ensure that they safely perform their work. *Koch Refin. Co.*, 11 S.W.3d at 157.

Andrus further contends that Vestas negligently selected SEA as its contractor. Therefore, according to Andrus, there is a fact issue as to Vestas' liability. Andrus, however, did not plead a negligent hiring claim in his live petition. For that reason, Andrus failed to preserve a negligent hiring claim for our review, and we decline to consider it. Tex. R. App. P. 33.1(a)(1)(A).

Because Vestas has negated the existence of a legal duty, which "is the 'threshold inquiry in a negligence case[,]'" we need not consider Andrus' remaining appellate arguments, all of which depend on such a duty. *Houston Area Safety Council, Inc. v. Mendez*, 671 S.W.3d 580, 582 (Tex. 2023) (citation omitted).

We overrule Andrus' arguments as to Vestas.

## B. SEA

SEA, like Vestas, sought to rely on its independent contractor status to shield it from liability to Andrus. Although SEA was, as it claims, an independent contractor of Vestas, this status alone does not necessarily absolve it of any duty to Andrus.

### 1. Contractual Duty

As noted above, the contract between SEA and Vestas dictates that SEA "shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to, persons or property." The addendum to the contract required SEA to "[o]versee that all third[-]party contractors working for

15

Company follow industry standard safety protocols and comply with Company's health, safety and environment policies. Should there be a breach, Contractor will stop work on behalf of Company and conduct a safety stand down meeting."[6] This language imposed a contractual duty on SEA to, as the contract states, ensure compliance with industry and Vestas' standards.

Andrus contends that SEA's above-described contractual duty enabled SEA to control P.C. Pfeiffer's work, and that SEA exercised this control. Again, we disagree. As we previously observed, the authority to enforce compliance with safety standards does not establish the degree of control necessary to render SEA liable for Andrus' injury. *See Hoechst-Celanese Corp.*, 967 S.W.2d at 356-57. Moreover, the record does not indicate that SEA exercised actual control over Andrus' work, including the work he was doing when he was injured. There is no duty under the contract, despite this general "reasonable precaution language," because that language doesn't create a duty to third parties who are strangers to the contract, including independent contractors. The only people those provisions in contracts are usually intended to protect are the parties to the contract. In order for a third party beneficiary to recover on a contract made between other parties, the contracting parties must have intended to secure a benefit to that third party and only if the contracting parties entered into the contract directly for the benefit of the third party.

---

[6] In this context, SEA was the contractor and Vestas was the company.

16

*See Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002); *see also Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011) (holding that third parties may enforce a contract it did not sign "when the parties to the contract entered the agreement with the clear and express intention of directly benefitting the third party[]"). Determining the contracting parties' intent is based on an examination of the entire agreement, and we are to "give effect to all the contract's provisions so that none are rendered meaningless." *Stine*, 80 S.W.3d at 589. The mere fact that a person might receive an incidental benefit from a contract does not give that person a right of action to enforce the contract. *Id*. In determining whether a third party can enforce a contract, the intention of the contracting parties is controlling. *S. Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 306 (Tex. 2007). "The intent to confer a direct benefit upon a third party 'must be clearly and fully spelled out or enforcement by the third party must be denied.'" *Id*. (citing *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999). Courts may not create third-party beneficiary contracts by implication. *Stine*, 80 S.W.3d at 589. "[T]here is a presumption against conferring third-party-beneficiary status on noncontracting parties." *Id.; see also Tawes*, 340 S.W.3d at 425 ("All doubts must be resolved against conferring third-party beneficiary status."). *Corley v. Am. Well Control, Inc.*, No. 09-11-00147-CV, 2012 Tex. App. LEXIS 8138, at \*6-8 (Tex. App.—Beaumont Sep. 27, 2012, no pet.) (mem. op.).

17

Andrus argues that SEA's duty to him arose from the duty it assumed under its contract with Vestas to assure that "all third-party contractors working for [Vestas] follow industry standard safety protocols and comply with [Vestas'] health, safety and environment policies." But in our opinion, that provision amounts to nothing more than a provision authorizing SEA to stop PC Pfeiffer's work. The provision does not show that SEA retained a right of control or supervision over PC Pfeiffer's work that PC Pfeiffer wasn't free to do its work in its own way.

There isn't any evidence that Horne gave Andrus any instructions about his work on the day his injury occurred including about how to unhook a windmill blade as he was working several feet above the ground. There is no evidence that Horne saw Andrus while he was working above ground; instead, the evidence shows that Horne was standing around 100 yards from where Andrus was working when the injury occurred.

Another portion of the contract between Vestas and SEA obligates SEA to "[i]nspect trans-loading equipment and rigging intended for the operation to ensure compliance with all standards and/or Company's specifications." In addition, specifications attached to the contract provided that SEA was to: "Prepare a detailed overview (reports) of the overall discharge operation. This overview should at least include: [] Gear and Lifting Equipment (i.e. type of cranes - both vessel and/or shore cranes – to be used for discharge, crane certificates, rigging equipment and

18

certificates, lift plans, ***visual inspection*** of all equipment and rigging).” (emphasis added). Andrus interprets this language as requiring SEA to inspect the man basket because it was a piece of equipment Andrus was using. The duty SEA owed under its contract was to perform a “visual Inspection of all equipment and rigging” which would have included the man basket. However, Andrus himself testified in his deposition that he visually inspected the man basket and saw no defects the morning of the accident:

> “Q. Okay. If you were to look in the basket that [] morning and see that something was broken, would you [] have told your supervisor?
> [] A. Yes. If I saw something, yes.
> [] Q. Okay.
> [] A. I would have.
> [] Q. You didn’t see anything that morning?
> [] A. No, ma’am.”

By his own testimony, Andrus indicates that there is no evidence that visual inspection would have revealed a defect in the man basket which would have revealed the failure that caused Andrus’ accident. The summary judgment response lacks any evidence showing that a visual inspection only would have revealed that the man basket, which had been used by Andrus from time to time, for up to six years at the location, was about to break that day.

We overrule Andrus’ first appellate point.

19

## 2. Causation

In his second appellate point, Andrus argues that fact issues about causation and damages preclude summary judgment. Because we find the lack of a duty exists, this second point as to causation is moot.

Accordingly, we overrule Andrus' second appellate point.

## C. Gross Negligence

Because Andrus has not shown that SEA was negligent, Andrus' gross negligence claim also fails. *See Trevino v. Lightning Laydown, Inc*., 782 S.W.2d 946, 949 (Tex. App.— Austin 1990, writ denied).

## D. Land Occupiers' Liability

Andrus argues that Vestas and SEA are liable to him because they occupied the property where he was performing his work. This argument is unpersuasive. *See Coastal Marine Serv. of Tex., Inc. v. Lawrence,* 988 S.W.2d 223, 225-26 (Tex. 1999). In *Lawrence*, our Supreme Court addressed the theories that support imposing liability on land occupiers for alleged premises defects. Although one who occupies property has a duty to warn of known dangerous conditions, that duty does not apply when, as here, the defendants were unaware of the condition. "[A] premises owner, merely by placing a safety employee on the work site, does not incur a duty to an independent contractor's employees to intervene and ensure that they safely perform their work." *Koch Refin. Co.*, 11 S.W.3d at 157. There was no evidence that either

20

Vestas or SEA knew of a dangerous condition or defect in the man basket. *Id.* Nor was there any evidence that either Appellee created a dangerous condition that caused the accident or injury. The man basket equipment was obtained and maintained exclusively by P.C. Pfeiffer. Accordingly, even if Appellees were acting as land occupiers at the time of the accident, they would owe Andrus no duty absent a right of control, which we addressed above.

## IV. Conclusion

Andrus failed to meet his burden to establish that either Vestas or SEA controlled or had the right to control the work he was performing when his injury occurred. Vestas' and SEA's contracts established that Andrus' employer, P.C. Pfeiffer, was an independent contractor on the jobsite when Andrus was injured, and neither Vestas nor SEA had the right to control the details of P.C. Pfeiffer's work. Additionally, no evidence shows that SEA knew, or reasonably should have known, that the "man basket" Andrus was working in when he was injured was unsafe. For these reasons, we conclude the trial court did not err in granting the Appellees' motions for summary judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on August 12, 2022
Opinion Delivered May 2, 2024

Before Golemon, C.J., Horton and Wright, JJ.